```
1        APPEARANCES:              PETER BRICK, Esquire
                                   8624 Government Drive
2                                  Suite 101
                                   New Port Richey, FL  34654
3                                     Appearing on behalf of
                                      the Plaintiff
4
5                                  TARA O'CONNOR, Esquire
                                   9735 US Highway 19
6                                  Suite 2
                                   Port Richey, FL  34668
7                                     Appearing on behalf of
                                      Defendant Venezia
8
9                                  Jerry Ferrara, Pro Se
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT
D

1    THEREUPON,

2                        JERRY FERRARA,

3    The deponent herein, being first duly sworn, was examine

4    and testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. BRICK:

7        Q.   Sir, will you please state your name.

8        A.   Jerry Ferrara.

9        Q.   And what is your residence address?

10       A.   I'm sorry?

11       Q.   What is your residence address?

12       A.   I will not give that at this time.

13       Q.   Why not?

14       A.   Because of harassment.

15       Q.   Well, what is your legal address?

16       A.   Same question, same answer.

17       Q.   Well, you're a party to this lawsuit.  You're

18   obligated to give the Court an address that you can be

19   contacted at.

20       A.   5541 Violet Drive.

21       Q.   You don't occupy that, correct?

22       A.   That is correct.

23       Q.   We've sent process servers out, all kinds of

24   things.  Obviously you received notice today, right?

25       A.   I did.

1    Q.  How did you receive notice?

2    A.  Via my title company.

3    Q.  But, again, I want on the record, this is not an

4  address that you occupy?

5    A.  No, it is not.

6    Q.  And you're refusing to give any other address?

7    A.  Same question, same answer.

8    Q.  Is there someone at the Violet Drive address

9  that can accept service of process for you or can forward

10 notices to you?

11   A.  Yes.

12   Q.  Are you authorizing the person, whoever is

13 occupying that house, to receive process for you?

14   A.  Yes.

15   Q.  And who might that person be?

16   A.  Carter Hugens.

17   Q.  What's the last name?

18   A.  Hugens, H-U-G-E-N-S.

19   Q.  And is that person -- what is that relationship

20 of her to you?

21   A.  Assistant.

22   Q.  Assistant.  Does she -- he live in the house?

23   A.  Yes.

24   Q.  And this Violet Drive address, is that the

25 property that was purchased by 5521 Violet Land Trust

1    from Ms. Langlois?

2        A.   Could you rephrase that question?

3        Q.   The address we're talking about, 5521 Violet --

4             MS. LANGLOIS:   41.

5        Q.   (By Mr. Brick) 41.  Is that the property that

6    was purchased from Ms. Langlois, first by you and then by

7    subsequently now owned by the 5541 Violet Land Trust?

8        A.   I don't quite understand that question.

9        Q.   You have an interest in the Violet Drive

10   address?

11       A.   Yes, I do.

12       Q.   What is that interest?

13       A.   Ownership, owner of the land trust.

14       Q.   In your name alone through the land trust?

15       A.   Through the land trust.  I was a beneficial

16   interest of that land trust.

17       Q.   And who did the land trust buy it from?  How did

18   the land trust acquire title?

19       A.   I can't answer that at this time.

20       Q.   Because you don't know?

21       A.   Because I'm not sure at this time.

22       Q.   You're not sure?

23       A.   No.

24       Q.   At one time did you personally have title to

25   this property?

1    A.   I can't recall at this time.

2    Q.   At one time did you enter into a contract for

3  sale for this property?

4    A.   Yes, I did.

5    Q.   And with whom did you enter into the contract

6  for sale?

7    A.   Margetta Langlois.

8    Q.   And let me show you this document.  Ask you if

9  you recognize it.

10    A.   That's the sales contract for the property.

11    Q.   And what is the listed purchase price?

12    A.   $45,000.

13    Q.   And when did you execute that document?

14    A.   I do not recall.

15    Q.   Is there a signature on the page?

16    A.   Let's see.  Page Number 4.

17    Q.   And dated?

18    A.   Showing a date of 10/26/04.

19    Q.   Where was Ms. Langlois when that contract was

20  presented to her?

21    A.   Where was she?

22    Q.   Yes.

23    A.   Could you rephrase the question so I can

24  understand?

25    Q.   Do you know where she was?  How did you get her

1   to sign this?

2       A.   She had contact with me through one of my

3   advertisements.

4       Q.   Where was she when she signed that contract, if

5   you know?

6       A.   I do not recall.

7       Q.   Was she out of state?

8       A.   I don't recall.

9       Q.   Did you have to send this contract to get her to

10  sign it?

11      A.   I don't recall at this time.  It's been two

12  years.

13      Q.   Was a real estate broker involved in this

14  transaction?

15      A.   No, there was not.

16      Q.   Was there a title company involved in this

17  transaction?

18      A.   Yes.

19      Q.   Who is that title company?

20      A.   That was Guju Title Company.

21      Q.   And who owns Guju Title Company?

22      A.   Michael Guju.

23      Q.   Is he an attorney?

24      A.   Yes, he is.

25      Q.   Is he your attorney?  Was he your attorney at

1    that time?

2    A.   No, he was not.

3    Q.   Does he also run or operate or have an interest

4    in a company that acts as trustees for land trusts?

5    A.   I believe so.

6    Q.   And is he in fact or his company or a company he

7    has an interest in is in fact the trustee for the 5541

8    Violet Drive Land Trust?

9    A.   I can't recall that.

10   Q.   Well, you mentioned that you're a beneficial

11   owner of the 5541 Violet Land Trust?

12   A.   That's correct.

13   Q.   By virtue of a trust agreement?

14   A.   By virtue of a trust agreement.

15   Q.   Do you have that trust agreement?

16   A.   I'm going to have to check in my records.

17   Q.   And who is the trustee of that?

18   A.   The trustee company.

19   Q.   Pardon?

20   A.   The trustee company.

21   Q.   And what's the name of the trustee company?

22   A.   I don't recall right now.

23   Q.   And who set that trust up for you?

24   A.   The title company, Equity National.

25   Q.   And how did you get in contact, come to the

1    title company?

2         A.    I'd been using them for probably three or four

3    months before this transaction took place.

4         Q.    At any time did Attorney Guju provide legal

5    services for you?

6         A.    Same question, same answer.

7         Q.    You don't know?

8         A.    I had previously stated that he did not.

9         Q.    Your only contact with him was through this

10   trust and/or title work?

11        A.    As far as providing legal services for me as an

12   attorney?

13        Q.    Anything.

14        A.    I'd like for you to clarify your question.

15        Q.    I said, is the only contact or involvement you

16   had with him either through as a trustee through his

17   company or through the title group?

18        A.    That would be correct.

19        Q.    Who prepared this contract for sale?

20        A.    I did.

21        Q.    And what did you do with it after you prepared

22   it?

23        A.    Could you expand on that, please?

24        Q.    How did you get to Ms. Langlois?

25        A.    Same question, same answer, sir.

1    Q.   You don't remember?

2    A.   Not at this time.

3    Q.   Do you know whether or not the title company

4  assisted you in transferring this paperwork back and

5  forth from Ms. Langlois?

6    A.   It's the same question.

7    Q.   Apart from that contract for sale that I!ll mark

8  as my Exhibit 1 to the deposition, was there any other

9  written agreement between you and Ms. Langlois concerning

10  the terms and conditions of the sale of the house?

11    A.   None other than what is stated on the actual

12  contract which is there was an agreement for an

13  additional $10,000 after the property was sold.

14    Q.   Let me show you this document, my Exhibit B, and

15  ask you if you recognize that agreement.

16    A.   A portion of this agreement, yes.

17    Q.   In reference to the typed portion of this

18  agreement, who prepared that, if you know?

19    A.   I had.

20    Q.   And did you execute this -- I understand there

21  is a bunch of writing on here.

22    A.   Actually, let me make a correction.  The

23  agreement was the 15,000, not the 10 as I had stated

24  earlier.

25    Q.   So the purchase price then as you understood it

1    was the $45,000 plus the 15?

2        A.   No.

3        Q.   What was your understanding?

4        A.   My understanding was the purchase price was

5    45,000 with after the property being sold an additional

6    15,000 going back to Margetta Langlois.

7        Q.   So you're saying that this agreement was not

8    part of the terms of the sale?

9        A.   No.   It was not a part of the terms of sale.

10       Q.   But in any case, you would agree to pay her in

11   addition to the contract price at least the $15,000

12   evidenced in the typed portion of this?

13       A.   Yes, sir.

14       Q.   Again, I ask you the question:   Do you recall

15   who prepared this?

16       A.   Same question, same answer.

17       Q.   You don't recall?

18       A.   I have already told you who prepared this.

19       Q.   Tell me again.

20       A.   I have.

21       Q.   Okay.

22       A.   Now, there is writing on here that was not on

23   that original agreement.

24       Q.   I understand.   We'll talk about that in a few

25   minutes.   Was this submitted to Ms. Langlois along with

1   what would be the form contract for sale?

2       A.   I do not recall.

3       Q.   But you did execute the agreement, the second

4   agreement, for the additional $15,000?

5       A.   In a portion of what I see here only.

6       Q.   As far as the typed portion of it that you

7   signed?

8       A.   As far as the typed part, that is correct.

9       Q.   Now, let's look at the written part.  In the

10  bottom part here, it looks like PS, if repairs only cost

11  $14,000, then you would agree there is a statement here

12  that initial $10,000 will be paid?  Are you aware of

13  those words being -- those sentences being added to the

14  agreement?

15      A.   That I actually had told Ms. Langlois at some

16  point, which I do not recall the exact time, and

17  explained to her that was unacceptable.  I had never

18  signed it nor accepted it.

19      Q.   Do you know when that wording was put on there?

20      A.   I do not.

21      Q.   Do you recall receiving this agreement back with

22  Ms. Langlois' signature on it?

23      A.   Yes.

24      Q.   Were those words on it at that time?

25      A.   Yes, they were.

1    Q.   So these are words that she may have put on

2    after you signed it, but before she signed it?

3    A.   Words that were put on absolutely after this

4    contract was signed.

5    Q.   And you indicated then you subsequently had a

6    conversation with her.  When was that, that those terms

7    were not agreeable?

8    A.   I don't really recall.

9    Q.   Is it before or after the closing of the deal?

10   A.   I don't recall.

11   Q.   Do you have an original of this agreement?

12   A.   I believe I do, but I'm not exactly sure.  I'm

13   going to have to check through my records to see if I do.

14   Q.   Same thing with the contract for sale.  Do you

15   have the original of that document?

16   A.   I believe so.

17   Q.   And who assisted you in closing this property?

18   I think you already mentioned a title company involved.

19   A.   Correct.

20   Q.   Did you advise the title company of the

21   existence of this side agreement or this other agreement

22   that you were going to pay an additional $15,000?

23   A.   I don't recall at this time.

24   Q.   At any time have you advised the title company

25   that there was a side agreement to pay an additional

1      $15,000?

2           A.   Same question, same response.

3           Q.   Did you obtain a loan in order to purchase this

4      property?

5           A.   I did.

6           Q.   And with whom?

7           A.   This gentleman right here.

8           Q.   And how did you find out -- how did you get in

9      contact with Venezia Mortgage or Venezia Investments

10     LLC?

11          A.   To the best of my memory, it was through a

12     company called Integrity First Funding Group, I believe,

13     but I'm not positive on that.

14          Q.   And what paperwork, if any, do you recall

15     filling out for the obtaining of this financing?

16          A.   Standard hard money terms agreement.

17          Q.   Did you give a personal financial statement?

18          A.   No, I did not.

19          Q.   What kind of information do you recall providing

20     to them?

21          A.   Address, cost of repairs, projected value of the

22     property after repaired, which is also known as ARV,

23     after repair value.  That's pretty much typically what

24     needs to be given to acquire a hard money loan.

25          Q.   Were you involved in obtaining an appraisal on

1    the property?

2    A.   I do not recall if I had or if it was done by

3    the broker.

4    Q.   Did you advise the broker that you had an

5    additional agreement with Ms. Langlois to pay her another

6    $15,000 after -- at some point in time?

7    A.   I don't recall.

8    Q.   And you took title to this plot under your name

9    individually?

10   A.   I don't recall exactly how that was done.  I'd

11   have to check my records and see exactly the way it

12   followed through.

13   Q.   But at the time the loan was executed, you had

14   the property titled in the land trust; is that correct?

15   A.   I don't recall.  I'm going to have to check my

16   records.

17   Q.   Was it your intention all along to place this

18   property into a land trust?

19   A.   Yes, it was.  It's my intention with most

20   properties I purchase.  It's the standard procedure by

21   investors to protect the -- to protect the property and

22   to keep it safe.

23   Q.   Keep it safe from what, from who?

24   A.   Potential -- if you get into a car accident.

25   Q.   People suing you?

1  A. After you -- you know, anything like that.

2 Something I was taught when you're learning this

3 business.  It's something that's taught.  It's a standard

4 procedure to protect assets.

5  Q. Now, in this agreement, had you not agreed to

6 give Ms. Langlois a lien against the property for this

7 money owed?

8  A. Yes, I did.

9  Q. How were you going to do that?

10  A. How was I going to do that?

11  Q. Yes.

12  A. I would imagine she would file it as a lien

13 against the property.

14  Q. I ask you:  How would she do that?

15  A. I have no idea.  Couldn't answer your question.

16  Q. But you knew that --

17  A. At that time being new in real estate, I

18 believed that was the correct way to protect Ms. Langlois

19 or at least to keep her comfortable knowing that that

20 money was protected in the agreement that we had till the

21 property was sold.

22  Q. Your intention was -- a lien was to make her

23 feel comfortable that the money would be protected?

24  A. Yes.  By way of a -- by way of the home, had to

25 file a lien.  I had no idea, but it was in writing and I

1   signed it, too.

2       Q.   But you had no idea how she could get a lien on

3   the property?

4       A.   No, I don't.

5       Q.   But you did know as soon as you transferred it

6   to the land trust that it would be difficult for her to

7   get a lien on the property because it wasn't in your name

8   anymore?

9       A.   No, did not know that.

10      Q.   You did not know that.  You didn't put it in a

11  land trust to get it out of the reach of Ms. Langlois?

12      A.   No, I did not.

13      Q.   You didn't understand that would be the effect

14  of that?

15      A.   No, I didn't.

16      Q.   Now, we have already discussed Mr. Guju.  He is

17  an attorney that he had not given you any legal advice in

18  this process; is that correct?

19      A.   That's correct.

20      Q.   Had you received any other legal advice in this

21  particular process in the closing?

22      A.   Could you repeat that again?

23      Q.   I said, had you received any other legal advice

24  in this real estate transaction, this particular real

25  estate transaction?

1    A.   Just from my attorney.

2    Q.   Who was your attorney?

3    A.   At the time it was Edward Cole.

4    Q.   So you had some legal advice at that time?

5    A.   No, not at that time.  I got legal advice after

6  Ms. Langlois has placed a fraudulent lien against the

7  property.

8    Q.   But not at the time of this particular sale?

9    A.   No.

10    Q.   Were you aware that other papers were prepared

11  in reference to the closing?

12    A.   I don't recall at this time.

13    Q.   I'm going to show you this document.  Appears to

14  be a HUD-1 form and ask you if you recognize it.

15    A.   I do.

16    Q.   Do you recognize it?

17    A.   Yes, I do.

18    Q.   Is this the closing statement, HUD-1, in

19  reference to this transaction on the Violet Drive address

20  property?

21    A.   To the best of my knowledge.

22    Q.   You did sign this document?

23    A.   Yes, I did.

24    Q.   Do you recall when this closing took place?

25    A.   No, I do not.

1    Q.   This bears a date of 11/5/04.  Were you present

2    when this property closed?  Did you go to the title

3    company and finish the transaction?

4    A.   To the best of my knowledge, I believe so.

5    Q.   Would it be fair to say, you signed this -- you

6    don't know if you signed this closing statement before or

7    after Ms. Langlois signed it or do you?

8    A.   I do not recall at this time.

9    Q.   And I assume you read this closing statement

10   before you signed it?

11   A.   I would imagine I did read it before I signed

12   it.

13   Q.   To your knowledge, does that closing statement

14   reflect the signed agreement of Ms. Langlois to pay her

15   an additional $15,000?

16   A.   No, it does not.

17   Q.   Is there a reason why that additional

18   transaction is not reflected on that closing statement?

19   A.   At the time I believe it was just a personal

20   agreement between her and I.

21   Q.   And you don't know whether those kind of

22   agreements are required to be on this closing statement?

23   A.   At that time I did not.  I was new to real

24   estate at that time.

25   Q.   Why do you consider that a separate agreement

1   instead of part of the terms of the purchase of the

2   property?

3       A.   Because the agreement was that she would be paid

4   after the property was sold.  So, therefore, I assumed it

5   was a separate agreement that would take place when the

6   property was sold.

7       Q.   But the value of the $15,000 was part payment of

8   the house?

9       A.   No, it was not.

10      Q.   What was it for?

11      A.   It was an agreement to pay that -- well, I guess

12  it would be -- it would be an agreement to give her the

13  additional 15,000 after it was repaired.  Whichever way

14  you want to look at that.

15      Q.   Well, were you buying the house for $60,000?

16      A.   No.  I was buying the house for $45,000.

17      Q.   What was the additional $15,000 for?

18      A.   To basically give Ms. Langlois a little bit more

19  money out of it so that --

20      Q.   Just because you're a nice guy; you just wanted

21  to give --

22      A.   I'm going to refuse to answer that.

23      Q.   Well, it doesn't make any sense, sir.  Are you

24  saying -- it was part of the deal, wasn't it?

25      A.   I'm going to refuse to answer you at this time.

1    Q.   On what grounds?

2    A.   Same question, same answer.

3    Q.   No.   If you're refusing to answer, there's only

4  a few legal grounds you have for not answering a

5  question.   What are the reasons for not answering the

6  question?

7    A.   I'm stating I'm going to refuse to answer you at

8  this time.

9    Q.   What was your business or occupation at the time

10  this transaction took place?

11    A.   Real estate.

12    Q.   Real estate what?

13    A.   Buying and selling real estate.

14    Q.   And so that's your primary -- was your primary

15  occupation at the time?

16    A.   That, and also doing handyman work.

17    Q.   And how many properties did you have an interest

18  in at the time of this transaction?

19    A.   I don't recall.

20    Q.   Is there an estimate?

21    A.   I'm not going to give an estimate.

22    Q.   Had you used these configurations of buying

23  property from a person and turning it over to a land

24  trust in any transactions prior to Ms. Langlois?

25    A.   I don't recall at this time.

1    Q.    How many properties do you now own, investment

2    properties do you now own?

3    A.    Just the one in question.

4    Q.    This is the only real estate interest you have

5    now?

6    A.    Yes.

7    Q.    But you had others at the time of this

8    transaction with Ms. Langlois?

9    A.    Same question, same response.

10    Q.    You don't remember?

11    A.    I don't recall at this time.

12    Q.    If you did have other properties, would they

13    have been in a land trust?

14    A.    I believe so.

15    Q.    And did you use the address of the property as

16    the name of the trust as you had in this case?

17    A.    I don't recall.  It's a common practice.

18    Q.    I'm going to show you this other document and

19    ask you if this is in fact the deed that you received

20    from Ms. Langlois.

21    A.    I believe so.

22    Q.    This will be my Exhibit 4, I believe.  Let me

23    show you this next exhibit and ask you if you recognize

24    it.

25    A.    Yes, I do.

1      Q.   And is that the deed from you to the land trust?

2      A.   Yes, it is.

3      Q.   And it's dated the same day as the deed you

4 received from Ms. Langlois?

5      A.   I don't see a date on this.  Oh.

6      Q.   They're the same date, right?

7      A.   They're the same date, yes.

8      Q.   Now, if you knew ahead of time that you planned

9 to put this in a land trust, why did you enter into the

10 first transaction with Ms. Langlois in your name

11 individually?

12      A.   Because at the time I was new in real estate and

13 I thought that was the way things had to go.

14      Q.   Why did you think things had to go that way?

15      A.   It's what I was taught.

16      Q.   By whom?

17      A.   By reading books and by other investors that

18 were in the business.  It was a standard procedure.

19      Q.   But you in fact had two contracts for sale to

20 purchase this property or two agreements for the purchase

21 of this property; is that correct?  You had the standard

22 sale contract and you had this typed contract, correct?

23      A.   Correct.

24      Q.   And the prepared contract, the standard sale

25 contract for $45,000, you provided that to the title

1    company; is that correct?

2        A.   Correct.

3        Q.   And you provided that to the lender?

4        A.   Yes, I did.

5        Q.   And the second contract that required the

6    payment of an additional $15,000 and provided that you're

7    going to give a lien to the property, you did not provide

8    that to the title company; is that correct?

9        A.   I don't recall if I had or not.

10       Q.   You didn't provide that to the lender?

11       A.   I don't believe that I did.

12       Q.   And you did these two contracts knowing that at

13   the sale you were going to flip this property into a land

14   trust?

15       A.   You keep referring to them as contracts.  I

16   refer to those as an agreement as it is clearly stated at

17   the top.

18       Q.   What's the difference in your understanding

19   between an agreement and a contract?

20       A.   At that time I thought an agreement between two

21   individuals was pretty much something that guarantees

22   them payment by an agreement.

23       Q.   By giving them a lien?

24       A.   That's correct.

25       Q.   How --

1      A.   I have never disputed the fact that the $15,000
2  was owed to Ms. Langlois.

3      Q.   So you know today that you owe her $15,000?

4      A.   Not today I don't.

5      Q.   Why?

6      A.   Because a fraudulent lien was placed against the
7  property.  This could have been solved a long time ago
8  and great loss has incurred since then on my part, on the
9  lender's part.  That's why.

10     Q.   So you feel you have a counterclaim?

11     A.   Absolutely do.

12     Q.   But for the counterclaim, you would owe her the
13  money, the $15,000?

14     A.   I had a buyer for the property, and this could
15  have been settled.  And Ms. Langlois would have received
16  what she's entitled to as per the agreement, $15,000.

17     Q.   And this second written part in the back --

18     A.   Was trash.

19     Q.   Pardon?

20     A.   Is trash.

21     Q.   Trash.  Did she call you and say she was putting
22  that in there?

23     A.   No.  To the best of my knowledge, I do not
24  believe she called me.

25     Q.   Have you made payments to the mortgage holder on

1   this property?

2       A.   Yes, I did.

3       Q.   Are you current in those payments?

4       A.   No, I'm not.

5       Q.   How many payments have you made, if you know?

6       A.   I don't recall.  Probably somewhere in the area
7   of 10 to 12.

8       Q.   Payments?

9       A.   To the best of my numbers.

10      Q.   And what have you done with the property since
11  you bought it?

12      A.   Repaired the foundation.

13      Q.   When was that done?

14      A.   I don't recall the exact date.

15      Q.   Do you know approximately how long it took?

16      A.   I don't recall that either.  It probably took
17  about a week.

18      Q.   What else have you done?  Have you rented the
19  property out?

20      A.   Yes, I have.

21      Q.   How many individuals have you rented the
22  property out?

23      A.   To the best of my memory, it was a husband and
24  wife and three children.

25      Q.   Do you recall when?

1      A.   No, I don't.

2      Q.   Have you only had one tenant in there?

3      A.   Other than the person that's in there currently,

4  yes.

5      Q.   You have only had -- so is the husband and wife

6  you mentioned the people that are in there now?

7      A.   No.

8      Q.   So this was one tenant and now you have another

9  tenant in there?

10     A.   I don't know if you would call them a tenant

11  because there is no charge.  No rent is being charged.

12     Q.   And this Carter Hugens, is this the person

13  that's in there?

14     A.   Yes.

15     Q.   So she's living there without paying rent?

16     A.   The reason why she's there is to, one, keep the

17  property up, keep it clean, and have repairs and oversee

18  repairs being done, to keep the property in a presentable

19  condition right now.

20     Q.   And what do you plan to do with the house?

21     A.   There's not much I can do with the house right

22  now.  Is there?

23     Q.   Do you have the ability to cover the mortgage in

24  some way with --

25     A.   I do not.

1     Q.   Sale is the only alternative you have for this

2  house?

3     A.   Yes, it is.

4     Q.   You indicated that you did have a buyer at one

5  time?

6     A.   Yes, I did.

7     Q.   Do you recall when approximately that was?

8     A.   I do not.

9     Q.   Do you recall who your potential buyer was?

10    A.   Jean Davies.

11    Q.   Davies?

12    A.   Uh-huh.

13    Q.   And how did you obtain Mr. Davies as a

14  prospective buyer?

15    A.   I don't recall exactly how I obtained her,

16  but --

17    Q.   Was there a realtor involved?

18    A.   I don't recall.

19    Q.   Was there a contract to purchase?

20    A.   Yes, there was.

21    Q.   Do you recall the terms of the contract for

22  purchase?

23    A.   I do not.

24    Q.   Do you have a copy of the contract for purchase?

25    A.   I'm certain I do.

1       Q.   And did you engage the services of a title

2    company to assist you in this closing?

3       A.   Which -- what closing?

4       Q.   This potential closing with Jean Davies.

5       A.   To the best of my recollection, I believe I did.

6       Q.   Was that the same title company you used --

7       A.   Yes, it is.

8       Q.   Had you had any direct conversations with

9    Ms. Langlois concerning this contract?

10      A.   I do not remember.  I don't recall if I did or

11   if I didn't.

12      Q.   So you don't know what was discussed with her,

13   if any, concerning this new deal?

14      A.   I do not recall at this time.

15      Q.   Do you recall the purchase price of this?

16      A.   No, I don't.

17      Q.   Was it more than what was owed on the property?

18      A.   If I can't recall the price -- I would imagine

19   that it was equal or greater to what was owed on it

20   otherwise obviously it couldn't be done.  And when I say

21   equal or more to, that would include the $15,000

22   agreement to Ms. Langlois.

23      Q.   So the deal would have had to have been arguably

24   in excess of 85,000?

25      A.   It would have had to satisfy all parties

1    involved.

2        Q.   Other than this lawsuit, are you engaged in any

3    other litigation?

4        A.   To my knowledge, no.

5        Q.   Any of these other transactions you've been

6    involved in, have any problems occurred from them?

7        A.   What other transactions?

8        Q.   This is the only transaction you had any problem

9    with?

10        A.   How is that relevant to what we're here for

11   today?

12        Q.   I'm saying, has any other buyers complained --

13   sellers had any issue with you concerning any of these

14   other real estate transactions?

15        A.   Never.

16        Q.   Has there been any other foreclosures on any of

17   these other properties that you've had an interest in?

18        A.   I don't believe so.

19        MR. BRICK:   Let's take a few minutes if I can

20   and talk to my client and we'll come back.

21   RECESS

22        Q.   (By Mr. Brick) Just back in reference to the

23   agreement, this side agreement, whatever we want to call

24   it, agreement of the parties herein, do you recall

25   whether this agreement after it was signed by

1   Ms. Langlois came back to you or whether it came to the

2   tile company?

3       A.   I don't recall.

4       Q.   Do you recall whether you gave copies to

5   anybody?

6       A.   I don't recall that either.

7       Q.   Was there a lady that was acting as a go-between

8   really between Ms. Langlois and yourself, a realtor or

9   someone in that capacity?

10      A.   Oh, yes.  What's her name?  Linda.  I can't

11  remember her last name.  Her name was Linda.

12      Q.   In fact, she's the one that you had first came

13  in contact with on behalf of Ms. Langlois; is that

14  correct?

15      A.   I really don't recall.  It's been two years.

16      Q.   You don't recall whether she's the one who first

17  showed you the house?

18      A.   No, sir.  I don't remember the exact events of

19  how things came together at the time.

20      Q.   Do you recall whether at any time you gave her a

21  copy of this side agreement?

22      A.   No, I don't.

23      Q.   Do you know whether she was aware of the

24  existence of this agreement?

25      A.   I do not.

1       Q.   Now, on this handwritten part, it seems to

2   indicate that if Ms. Langlois was able to assist you in

3   getting the repairs done for under $14,000 then this

4   other money would become due.  Did Ms. Langlois assist in

5   obtaining or finding someone who could do this sinkhole

6   repair?

7       A.   She did tell me she had a company called Speeler

8   Foundation Repair that she had contacted.  My repair

9   company had given me an estimate of $34,000 to do the

10  job.  And she had said that she had a company that could

11  do it for $14,000.

12      Q.   And if you were able to get it repaired for

13  $14,000, wasn't the additional agreement that you would

14  pay her the additional 10,000?  Isn't that where this --

15      A.   This is what she's added in afterwards.  My

16  agreement was not -- I couldn't -- I could not comply

17  with 15,000 and then another, what, $10,000 here at a

18  purchase price of 45,000.  It brings it up so high and

19  now it's a repaired sinkhole property that you cannot

20  obtain full market value on it.  That's why it was

21  unacceptable.

22      Q.   So you're saying you never had that discussion

23  with her if she were able to give you someone that could

24  repair it for 14, you would give her additional money on

25  this side agreement?

1    A.   To the best of my memory, no.  It was just what
2    was written in here by her after it was signed.

3        Q.   Do you know whether you provided copies of any
4    of these agreements back to Ms. Langlois after they were
5    executed by everybody?

6        A.   I don't recall that right now.

7             MR. BRICK:   I have no further questions.

8             If this deposition is typed up or used for any
9    purpose, you have the right to read it.  The purpose of
10   reading it is to check for accuracy.  You can't
11   necessarily change anything.  You can make notations at
12   the end if you think something is in error and you have
13   additional things you want to add to it or you can waive
14   that right.  If you want to read it, you need to give
15   this young lady a phone number where she can contact
16   you.

17            THE DEPONENT:   (727) 434-4289.

18            MR. BRICK:   I assume then you're going to read
19   it?

20            THE DEPONENT:   Yes.

21            MR. BRICK:   This young lady may have some
22   questions for you.

23            MS. O'CONNOR:   Just a few if you don't mind.
24   BY MS. O'CONNOR:

25       Q.   You said you had tenants in the house at one

1    time, a husband and wife and three children.  Do you

2    recall their names?

3         A.   I don't, but I can find that information.

4         Q.   When were they tenants in the property?

5         A.   I don't remember the months either.  I can get

6    that information as well.

7         Q.   And when they were tenants, were you paying

8    Venezia Investments their mortgage payment?

9         A.   No.

10        Q.   So they were tenants afterwards, after you

11   defaulted on the loan?

12        A.   Yes, they were.

13        Q.   And did you collect rent at that time?

14        A.   I did for one month.

15        Q.   That's it?

16        A.   That was it.

17        Q.   Do you remember how much that was, by chance?

18        A.   I think it was -- I believe it was 750.

19        Q.   And you said Ms. Carter Hugens is living there

20   now?

21        A.   Yes.

22        Q.   She's not paying rent?

23        A.   No, she's not.

24        Q.   Does she have insurance on the property?

25        A.   No, she does not.  If you prefer for her not to

1  be there, I'll take her out of there immediately.  The

2  whole intention of it was to keep it clean.

3      Q.   Was there a tenant in between the husband and

4  wife and three children and Ms. Hugens?

5      A.   Yes, there was.

6      Q.   And who was that?

7      A.   His name was John Levetier (phonetic).

8      Q.   Is he any relation to Robin Levetier at Equity

9  National Title?

10     A.   No, he was not.  They have the same last name.

11 No relation.

12     Q.   Did he pay you rent?

13     A.   No, he did not.  The reason I -- there was a few

14 attempts.  The first time I put the tenants in there, the

15 agreement was a low rent, repair at his expense, get the

16 place cleaned up.

17     Q.   That was Mr. Levetier?

18     A.   No.  That was the first parties in there, the

19 husband and wife.  He was a handyman of sorts.  And

20 actually they caused more harm than good.  When John went

21 in there, I placed John in there because he basically

22 wound up homeless with his little girl.  And I also had

23 the same agreement with him.  Do some work in there for

24 me, get it cleaned up.  And the same result.

25     Q.   He did no work on the property?

1        A.   No.

2        Q.   Was the first tenant, the husband and wife, the

3    last name Mount, by chance?

4        A.   It may have been.   They were -- I believe they

5    were from Puerto Rico.

6        Q.   Did you have lease agreements with any of these

7    tenants?

8        A.   I believe I did with the first.

9        Q.   And you have a copy of that still?

10        A.   I'll check when I get back and see if I still

11    have that.   Jean Davies may.   Let me give you some more

12    information.   That tenant came from Jean Davies who was

13    the person who originally wanted to buy the house.

14        Q.   Which tenant?

15        A.   The very first one, husband and wife.   Her

16    intention was to purchase the house and place them in

17    there.   And so she had asked me would they be able to

18    stay there if he did work.   I said, I think that would be

19    a good idea.   And anyhow --

20        Q.   And when you had this buyer, Mr. Davies --

21        A.   Ms. Davies.

22        Q.   Ms. Davies.   You engaged Equity National Title

23    to do the closing paperwork?

24        A.   I don't really recall if I had or not.   I may

25    have.   I can contact Robin Levetier and ask her if I had.

1    Q.   Do you know why the property didn't close?

2    A.   Yes, I do.

3    Q.   What's that?

4    A.   There was a fraudulent lien on the property of a

5    $125,000.

6    Q.   Were any steps made to have that lien taken out

7    of the public records that you're aware of?

8    A.   With an attorney I attempted to -- we attempted

9    to try to get something resolved.

10   Q.   And obviously no good results?

11   A.   No.  At that point in time, Ms. Langlois had

12   stated that she wouldn't even accept money.  She wanted

13   the house back clear and free as it was given to me,

14   which is also not true, because obviously $45,000 had

15   been paid for the property.

16   Q.   If I can just refer you to the agreement, the

17   handwritten portion on the bottom, was that added after

18   you signed the agreement?

19   A.   Yes, it was.

20   Q.   And what date did you sign this agreement?

21   A.   10/27/04, according to the document.

22   Q.   And what date did Ms. Langlois sign the

23   document?

24   A.   10/28/04, according to the document.

25   Q.   To the best of your understanding, what was the

1   agreement?   How much payment was meant to be made to

2   Ms. Langlois?

3       A.   The $15,000.

4       Q.   And when was that supposed to be paid to her?

5       A.   Upon the sale of the property.   Upon the second

6   sale.   Correct.

7       MS. O'CONNOR:   I have nothing further.

8   DEPOSITION CONCLUDED

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF FLORIDA    )
    COUNTY OF PASCO     )
2

3

4           I, the undersigned authority, certify that
    JERRY FERRARA, personally appeared before me and was duly
5   sworn.

6           WITNESS, my hand and official seal this 27
    day of ___August___, 20_0_6

7

8

9

10

11

12

13

14

15              _____
                Lisa Mitchell, RPR
16              Notary Public, State of Florida

17

18

19

20

21   Contacted deponent @ #
22   he gave. not a working
23   #. So couldn't Read.
24

25

1 | STATE OF FLORIDA   )
COUNTY OF PASCO     )

2

3          I, Lisa Mitchell, Registered Professional
Reporter, certify that I was authorized to and did
4 stenographically report the foregoing deposition of JERRY
FERRARA; that a review of the transcript was requested;
5 and that the transcript is a true and complete record of
my stenographic notes.

6          I FURTHER CERTIFY that I am not a relative,
7 employee, attorney or counsel of any of the parties, nor
am I a relative or employee of any of the parties'
8 attorney or counsel connection with the action, nor am I
financially interested in the action.

9          DATED this 2N day of August 20 08

10

11

12

13

14

15

16          _____
17          Lisa Mitchell, RPR

18

19

20

21

22

23

24

25